UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

_____

Linda M. O'Connor,                              Civ. No. 03-CV-3534 (JNE/JGL)

        Plaintiff,

vs.                                             **MEMORANDUM OF LAW IN**
                                                **SUPPORT OF DEFENDANT'S**
                                                **MOTION FOR SUMMARY**
Metropolitan Council,                           **JUDGMENT**

        Defendant.

_____

## INTRODUCTION

Plaintiff, Linda O'Connor, effectively resigned from her employment with Defendant, Metropolitan Council ("Met Council"), when she failed to return to work after exhausting all of her available leave. O'Connor now claims disability discrimination under state and federal law, even though she does not have a substantially limiting impairment. Since O'Connor received workers' compensation benefits for the same "disability," she has no claim under state law. O'Connor has no cause of action, under any theory, and her lawsuit should be dismissed.

## STATEMENT OF ISSUES

1.      Whether Met Council properly terminated O'Connor when she could not return to work following the exhaustion of all available leave under the Family and Medical Leave Act (FMLA).

2.      Whether O'Connor's Minnesota Human Rights Act (MHRA) disability claim is pre-empted by Minnesota's Workers' Compensation Act because her alleged disability arose out of a workplace injury.

3.      Whether O'Connor is disabled under the MHRA or Americans with Disabilities Act (ADA) when she only suffers from a temporary limiting condition.

4.      Whether O'Connor has a claim for disability harassment or retaliation based upon her supervisor's criticism of her performance.

## STATEMENT OF UNDISPUTED FACTS

**Metropolitan Council**

Met Council is a political subdivision of the State of Minnesota. Minn. Stat. § 473.123, Subd. 1. Marshall Aff. Ex. 29, p. 8. It assists local communities with planning needs and oversees effective and efficient public transportation, among other obligations. Marshall Aff. Ex. 29, p. 6. Minn. Stat. § 473.146, Subd. 1; Minn. Stat. § 473.1465; Minn. Stat. § 473.191; Minn. Stat. § 473.371; Minn. Stat. § 473.405, Subd. 4. By statute, Met Council has the power to exclusively prescribe all terms and conditions for the employment of its employees. Minn. Stat. § 473.129, Subd. 2; Minn. Stat. § 473.405, Subd. 1; Minn. Stat. § 473.415, Subd. 1; Minn. Stat. § 473.449. Unions represent many of Met Council's employees. O'Connor was a member of AFSCME. Marshall Aff. Ex. 1, p. 24.

Met council offers employees the opportunity to receive workplace adjustments should a disability need accommodation. Met Council also provides leave in accordance with state and federal law according to its business needs at the time.

**O'Connor and Her Met Council Positions**

O'Connor first worked for Waste Management in 1988 and remained in her position until 1996, when her area became part of the Met Council. Marshall Aff. Ex. 1, p. 74; Ex. 29, pp. 9-10. At that time she began working as a Planner, a job she had never worked before. Marshall Aff. Ex. 1, p. 76.

For the first two years in planning, she worked on special long term projects but then settled in to her planning responsibilities. Id at pp. 76-77. She is 57 years old.

**O'Connor's Health Condition**

In 1977, O'Connor learned that she was allergic to cats, dust and pollen. Id. at p. 60.   She treated with medication and shots and rarely, if ever, suffered from any adverse symptoms.  Id. at p. 61.  The only respiratory problems she has had occurred while working in the Mears Park building in St. Paul from 1988 to 2002.   Id at p. 62.

O'Connor first noticed problems in 1998 when she suffered from a couple of dizzy spells. Id. at p. 80.  Once, her co-workers took her to St. Paul to Fairview Southdale Hospital to have her checked out following a dizzy spell. Id at pp. 80-81.   Later, she had a series of respiratory problems such as pneumonia, sinus infections, and watery eyes which she attributes to the air quality and mold[1] at the Mears Park building. Id at pp. 96-97; Marshall Aff. Exs. 2 and 3.  She missed significant time from work between 1998, and 2002, utilizing her FMLA leave in almost every year. Marshall Aff. Exs. 31, 32; Karels Aff.  In the Fall of 1999, she also missed time to be with her father as he succumbed to cancer.   Marshall Aff. Ex. 1, pp. 84-85.   O'Connor's absences were unpredictable for the most part.  Her supervisor would not know on any given day whether she would attend work.  This affected the scheduling of work and O'Connor usually received short-term projects as she could not be relied upon to complete a long project.  Marshall Aff. Ex. 8.

O'Connor brought a workers' compensation claim in November 2001 against Met Council claiming her work had caused her respiratory problems and that she should be compensated for time missed from work.  Marshall Aff. Ex. 1, pp. 245-47; Ex. 4.  Her claim was resolved by settlement in 2004.  O'Connor, in the settlement agreement, contends that she was temporarily totally disabled from May 15, 2002 to July 1, 2003, and again from July 1, 2003 to

---

[1] Interestingly, her allergist found that she does not have a sensitivity to mold.  Marshall Aff. Ex. 1 pp. 236-37.

the present.  Id.  The settlement resolves all claims for benefits, including wage replacement benefits, on a full, final and complete basis. Id.

O'Connor only experienced respiratory symptoms at work in the Mears Park building. She has felt great since leaving the building and has had no problems whatsoever.  Marshall Aff. Ex. 1, pp. 61-63.  She leads a normal life and engages in any activity she wishes.  She only avoids smoke-filled bars and restaurants.  Id. at p. 249.

**Mears Park Building**

O'Connor worked in the Mears Park building in downtown St. Paul for the majority of her 14 years of employment.  Marshall Aff. Ex. 1, pp. 75-76.  Her jobs have put her on the second, fourth and sixth floors at various times.  Id. at pp. 75-76, 131.

The Mears Park building is over 100 years old.  It is owned by the St. Paul Port Authority and Met Council leases its space through Welsh Companies. Marshall Aff. Ex. 30; Karels Aff. Another company provides building services such as maintenance and heating and ventilation.

O'Connor and others raised anecdotal concerns about the building.  Tests were performed in the building, but no unusual problems were found.  It was decided to update the building's antiquated heating and ventilation system and give it a thorough cleaning.  This work commenced on February 6, 2002 and was completed on April 26, 2002.  Marshall Aff. Ex. 1, p. 202, Ex. 30; Karels Aff.

**O'Connor's Work Performance**

O'Connor had several supervisors during her years of employment with her last two supervisors being Dick Thompson and Phyllis Hanson.  Marshall Aff. Ex. 1, pp. 76-79. Thompson and Hanson had several issues with O'Connor.  Marshall Aff. Exs. 5; 6; 7; Ex. 9, p. 58-63; Ex. 28, pp. 42-43; Exs. 5, 33.  She was reprimanded for mistakes in her work, as well as

lack of effort, time spent on personal matters, and overall trust. Id.  For example, shortly after Hanson became her supervisor, in March 2001, O'Connor deliberately falsified her time sheet to get paid for time taken off, when she should have been attending a conference.  Marshall Aff. Ex. 1, p. 145; Ex. 9, pp. 31-32.  Both Thompson and Hanson gave poor reviews of O'Connor's performance over several years.  Marshall Aff. Exs. 5; 6; and 7.  O'Connor's frequent leaves prevented her from receiving certain projects due to her unavailability. Marshall Aff. Ex. 8. O'Connor knew of the problems her supervisor faced when having to assign her work.  Marshall Aff. Ex. 1, p. 203.

**O'Connor's "Accommodation" Requests**

On April 9, 2001, shortly after discovery of her time sheet deceit, O'Connor wrote her supervisor, Hanson, requesting a meeting to discuss "modifications" to her employment because of O'Connor's "on going health problems/time missed from work."  Marshall Aff. Ex. 10. O'Connor says that shortly thereafter, she and Hanson discussed her working at home, working in another location, and an air filter for her cubical area.  Marshall Aff. Ex. 1, pp. 159-61. Following these discussions Hanson denied the alternative work locations.  Id. at 160.

In October 2001, O'Connor's allergist wrote a letter recommending she take a month leave. Marshall Aff. Ex. 3.  The allergist did not actually write the letter because O'Connor drafted a letter, which the doctor merely signed.  Marshall Aff. Ex. 11.  O'Connor had also been coordinating her leaves through an employee in Met Council's Human Resources. Marshall Aff. Ex. 1, pp. 169, 172-74.  Again in November 2001, O'Connor discussed telecommuting from home which Hanson denied.  Marshall Aff. Ex. 12.  Hanson denied O'Connor's requests because the job required a presence in the building to attend meetings, including the meeting of the Met Council members on Wednesdays.  Marshall Aff. Ex. 1, pp. 188-89.  Furthermore, O'Connor's

work performance did not justify her working off site. Marshall Aff. Ex. 9, pp. 135-37. Finally, O'Connor's need for close supervision and monitoring also negated an opportunity for telecommuting. Id. Hanson, was amenable to an alternative work location a couple of days per week. Id. at p. 154.

When O'Connor returned from leave in December 2001, O'Connor complained that two other employees were allowed to work from home. Id. at pp. 137-140. These persons were not planners, but researchers whose job did not require a daily presence at the Mears Park building, and these were only temporary assignments while the building was cleaned. Id.; Marshall Aff. Ex. 29. pp. 14-16, 30-31.

O'Connor requested that she work in the Metro 94 building, a building North of downtown St. Paul, two days per week while the Mears Park building was cleaned and repaired. Marshall Aff. Ex. 1, pp. 195-196; Ex. 13. In January 2002, Hanson considered the request and arranged for work for O'Connor to do should the request be accepted. Marshall Aff. Ex. 9, p. 150; Exs. 14, 15, 19. O'Connor's request was denied by the Director of Human Resources, Richard Brainerd, for the same reasons that Hanson declined telecommuting the year before, the requirement that she be at Mears Park and O'Connor's need for direct supervision to ensure she would actually perform the work. Marshall Aff. Ex. 16; Ex. 28, pp. 28-32; Ex. 34. O'Connor grieved the decision and, to resolve the grievance, Met Council and O'Connor agreed that she would work 8 days, or two days per week, between March 19 and April 26 at Metro 94, while the Mears Park building was being cleaned and updated. Marshall Aff. Exs. 14; 17; 18; and Ex. 28, p. 32. O'Connor appeared for work at Metro 94 on March 22, 2002, but Met Council's facilities personnel had not yet moved work materials for O'Connor to Metro 94. Marshall Aff. Ex. 1, pp. 209-210. O'Connor did work there one day the following week but she worked no

more despite the fact Hanson had other work for O'Connor to perform.  Marshall Aff. Ex. 1, pp.

210-11; Ex. 9, pp. 155-56; Ex. 21; Ex. 29, p. 33.   O'Connor began another leave on April 18,

following an April 15 note from her doctor that he was "convinced" she could not work in the

Mears park building. Marshall Aff. Ex. 1, p. 223; Ex. 20.

### O'Connor's Termination

O'Connor's twelve week annual FMLA entitlement expired on midnight, April 25, 2002,

the day before the Mears Park cleaning and renovation was completed. Marshall Aff. Ex. 1, p.

30; Ex. 28, pp. 66, 69; Karels Aff.  Prior to the expiration date, on April 24, 2002, Met Council

sent O'Connor a notice advising her that her FMLA entitlement was "exhausted" and that she

was "required to contact her Supervisor/Manager on or before April 26, 2002 of your intention to

return to work."  Marshall Aff. Ex. 1, p. 30; Ex. 22.  She was also to provide a return to work

certification from her doctor by May 9.  Marshall Aff. Ex. 22.  O'Connor did not contact her

supervisor, Hanson.  Hanson, on the other hand, had tried to set up meetings with O'Connor to

go over her review but O'Connor canceled the meetings.  Marshall Aff. Ex. 1 p. 43; Exs. 23 - 25.

On May 2, 2002, Hanson mailed the review to O'Connor's home.  Id.

Having heard nothing from O'Connor, Met Council sent her another letter on May 3,

2002, this time from the Director of O'Connor's area, Eli Cooper.  Marshall Aff. Ex. 24.

Cooper reiterated that she was expected to return by May 9, 2002 and that her authorized leave

expired as of that date. Id.  He specifically told her that, under the AFSCME contract, "[y]ou will

be considered to have resigned your position with the Metropolitan Council if you are absent for

more than three working days without authorized leave."  Id.  O'Connor did not call her manager

or Cooper about her return to work.  Marshall Aff. Ex. 1 p. 44.

On May 3, 2002, O'Connor secured a certificate from her family doctor stating she was taking antibiotics and that she had a follow-up appointment in mid-May.  Marshall Aff. Ex. 2, Question 7 of the form asks whether absence from work will be required and whether the employee is unable to perform work.  Id.  The doctor did not answer the question. Id; Ex. 28 p. 76.    O'Connor sent this response to Met Council on May 6.  Marshall Aff. Ex. 1 p. 32.  She testified she did not feel physically able to return to work and she reports that her physician shared the same opinion.  Id. at pp. 34-35.

May 9 came and went with no call from O'Connor as to her whereabouts.  So did May 10.  Marshall Aff. Ex. 28 pp. 64, 79  The next work day was May 13.  Marshall Aff. Ex. 28 p 79.  No one heard from O'Connor that day or the next.  Id.  Accordingly, on May 15, in accordance with the specific provisions of the AFSCME contract, O'Connor resigned her employment and termination resulted.  Marshall Aff. Ex. 27; Ex. 28, p. 80. O'Connor was offered a meeting with Met Council representatives but she declined to meet and waived her right to grieve her termination through the union.

O'Connor took early retirement from Met Council and now works in a real estate business, having secured a real estate license in late 2002. Marshall Aff. Ex. 1 pp. 10, 20.  On October 18, 2002, she brought a charge of discrimination followed by this suit on June 27, 2003.  She claims that the Met Council violated the FMLA, MHRA and ADA.  Met Council moves for summary judgment.

## ARGUMENT

### I.    Summary Judgment Standard

Summary judgment "is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S. Ct. 2548 (1986)(quoting Fed. R. Civ. P. 1). District courts may grant summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Fed. R. Civ. P. Rule 56; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247; 106 S. Ct. 2505 (1986). The moving party must demonstrate that no genuine issues of material fact are left to be resolved. Celotex Corp., 477 U.S. at 322. In determining whether summary judgment is appropriate, the court must resolve all controversies in favor of the non-moving party. Matsushita Elec. Indus. Co., v. Zenith Radio Corp., 475 U.S. 574, 587; 106 S. Ct. 1348 (1986). However, the non-moving party may not rest on the allegations or denials of the pleadings, but must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 256. "[S]ummary judgment is appropriate when a plaintiff fails to establish a factual dispute on an essential element of her case." Snow v. Ridgeview Medical Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997); Wilking v. County of Ramsey, 153 F.3d 869, 872 (8th Cir. 1998).

To defeat this motion, O'Connor must introduce facts which are admissible at trial and which establish the elements for each of her claims. O'Connor cannot establish the elements of her claims and Met Council is entitled to summary judgment.

## II.  Met Council Fulfilled Its Obligations Under the FMLA

The FMLA requires that an employer of 50 or more persons, give an employee with a tenure of at least a year and 1250 hours of work in a given year, up to a total of 12 weeks annual

leave for a serious health condition.  29 U.S.C. § 2611(2); 29 U.S.C. § 2612(a)(1).  The employee, at the conclusion of the leave, must be returned to her former or an equivalent position.  29 U.S.C. § 2614(a)(1).  An employer may require that the employee receive certification from her physician that she is able to return to work.  29 U.S.C. § 2614(a)(4).  The employee's return may be certified by the physician.  If an employee has exhausted her FMLA and the employee is unable to return to her job following the leave, the employer's obligations under the FMLA cease and the employer may replace or terminate the employee.  29 CFR § 825.214(b); Reynolds v. Phillips & Temro Industries, Inc., 195 F.3d 411, 414 (8th Cir.1999); Hatchett v. Philander Smith College, 251 F.3d 670, 677 (8th Cir. 2001).

In this case, Met Council advised O'Connor on April 24 and May 3, 2002, that she had exhausted her FMLA entitlement and asked her to provide a physician's certification allowing her to return to work by May 9, 2002. Marshall Aff. Exs. 22, 24.   She was specifically told she had no more authorized leave and that she would be terminated under the AFSCME contract if she failed to return.  See 29 U.S.C. § 2614(a)(4)(the FMLA physician certification paragraph does not supersede the terms of a collective bargaining agreement).  O'Connor did not provide a certification allowing her to return to work and O'Connor testified she was unable to return to work in any event, an opinion shared by her physician even though he said nothing in his certification. Marshall Aff. Ex. 1 pp. 34-35; Ex. 2.  Having exhausted her entitlement and failing to return to work, O'Connor has no further FMLA rights and Met Council no further FMLA obligations.   See Slaughter-Cooper v. Kelsey Seybold Med. Group, No. 03-20965 (5th Cir. July 26, 2004)(Physician terminated after she failed to return from 12 weeks of FMLA leave had no claim); see also Carlsen v. Green Thumb, Inc., No. 01-2076 (JRT/RLE)(D. Minn. February 4,

2004)(FMLA interference claim requires entitlement to benefit).  Marshall Aff. Ex. 38, 40. O'Connor's FMLA claim should be dismissed.

## III.    O'Connor's Disability Discrimination Claims Should Be Dismissed

### A.    Workers' Compensation Preempts Her MHRA Claim

For injuries arising during a person's employment, workers' compensation provides the exclusive remedy.  Minn. Stat. §§ 176.021; 176.031.    Under Karst v. F.C. Hayer Co., 447 N.W.2d 180 (Minn. 1989), worker's compensation remains her sole remedy, even to the exclusion of a discrimination claim.  Workers' compensation remains exclusive, even if an underlying disability pre-existing the employment is aggravated by the workplace.  Benson v. Northwest Airlines, 561 N.W.2d 530, 540-41 (Minn. Ct. App. 1997) *review denied*.  O'Connor admits her respiratory condition was caused solely by her work environment.  She further sought and collected benefits from the workers' compensation system for this condition. Marshall Aff. Ex. 1 pp. 245-47; Ex. 4.  Her MHRA claim is barred by Minnesota law.[2]

### B.    O'Connor's Accommodation Claim is Barred by the Applicable Statue of limitations

The MHRA requires that a charge be brought within one year.  Minn. Stat. § 363A.28, Subd. 2.  The ADA requires a claim be brought in 300 days.  42 U.S.C. § 12117(a); 42 U.S.C. § 2000e-5(e)(1).  O'Connor brought her charge in October 2002 claiming, in part, that she was not reasonably accommodated by being allowed to work at home.  This accommodation was first denied in April of 2001 and again in November 2001.  Marshall Aff. Ex. 1 p. 160, 188-89; Exs.

---

[2] O'Connor's termination resulted from the mechanics provided by the AFSCME collective bargaining agreement. She, however, decided not to grieve that process of her termination as required under the contract.  Since an interpretation of the union contract would be involved in assessing her termination, the remedies provided by the contract should be exhausted before bringing suit.  See  McDaniel v. United Hardware Distributing Co., 469 N.W.2d 84, 88 (Minn. 1991)(Holding that no exhaustion of collective bargaining required where there is no interpretation of the contract required); Edina Educ. Ass'n v. Board of Educ. of Indep. Sch. Dist. No. 273, 562 N.W.2d 306, 310 (1997) (generally, an employee must exhaust all administrative remedies provided under a collective bargaining agreement before bringing an action derived from that contract in district court), *review denied*.

12, 16.24; Exh. 28 pp. 28-32.  A denial of an accommodation is a discrete act which is not a continuing violation of the law which would extend a limitations period.  See Stuevecke v. New York Hosp. Medical Center of Queens, 2003 U.S. Dist. LEXIS 14793 (E.D.N.Y.2003), *unreported.*  Marshall Aff. Ex. 37.  O'Connor's accommodation claim is barred.

    **C.**    **O'Connor is Not Disabled Under the ADA or MHRA**

    O'Connor claims her termination violates the ADA and the MHRA.  Because she suffers no substantial impairment of any major life activity, she has no claim.

    The ADA prohibits discrimination by an employer "against a qualified individual with a disability because of the disability of such individual in regard to . . . employment . . ."  42 U.S.C. § 12112(a).  The MHRA prohibits similar discrimination.  Minn. Stat. § 363A.08, subd. 2.  Minnesota courts analyze disparate treatment claims under the MHRA the same way as federal courts analyze Title VII and ADA claims.  Anderson v. Hunter, Keith, Marshall & Co., 417 N.W.2d 619, 623 (Minn. 1988).  O'Connor must first establish a prima facie case of disability discrimination by showing she: (1) is a disabled person within the meaning of the statute; (2) is qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) suffered adverse employment action because of her disability.  Treanor v. MCI Telecomm. Corp., 200 F.3d 570, 574 (8th Cir. 2000); Price v. S-B Power Tool, 75 F.3d 362, 365 (8th Cir.), *cert. denied*, 519 U.S. 910, 117 S. Ct. 274 (1996).  Once she has made her prima facie case, the burden of production shifts to Met Council to articulate a legitimate, nondiscriminatory reason for its actions.  Snow v. Ridgeview Med. Ctr., 128 F.3d 1201, 1205 (8th Cir. 1997).  If Met Council successfully makes this showing, the burden of production shifts back to O'Connor to demonstrate that Met Council's proffered reason is a pretext for unlawful discrimination.  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507-08, 113 S. Ct. 2742, 2747-48

(1993); <u>Snow</u>, 128 F.3d at 1206. The ultimate burden of proving unlawful discrimination always rests with the plaintiff. <u>See</u> <u>St. Mary's Honor Ctr.</u>, 509 U.S. at 507; <u>Snow</u>, 128 F.3d at 1205.

To be disabled, O'Connor must first establish the existence of a physical or mental impairment that substantially or materially limits a major life activity. <u>See</u> 42 U.S.C. § 12102(2)(A)-(C); Minn. Stat. § 363A.03, Subd. 12; <u>Snow v. Ridgeview Med. Ctr.</u>, 128 F.3d at 1206 (analyzing disability claims under ADA and MHRA). Guidance as to the meaning of "major life activities" is found in the regulations promulgated under the ADA. <u>See</u> <u>Weber v. Stripit, Inc.</u>, 186 F.3d 907, 912-13 (8th Cir. 1999) (analyzing disability claims under ADA and MHRA).

Under EEOC regulations, to be substantially limited in a major life activity, a person must be:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity

29 CFR § 1630.2 (j)(1).

Among the factors to be considered are the "permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 CFR § 1630.2 (j)(2)(3); <u>Heintzelman v. Runyon</u>, 120 F.3d 143, 146 (8th Cir. 1997)("Statutory disability requires permanent or long-term limitations").

Along these lines, the regulations require that O'Connor has no limitations in any reasonable sense. Her respiratory condition is not permanent. <u>See</u> <u>Rinehimer v. Cemcolift, Inc.</u>, 292 F.3d 375, 380-81 (3rd Cir. 2002)(Pneumonia a temporary condition and sensitivity to dust and fumes not a substantial impairment); <u>Land v. Baptist Medical Center</u>, 164 F.3d 423, 424-25

(8th Cir. 1999)(Allergic reactions were not substantially limiting where person's ability to breathe generally unrestricted).  She is symptom free outside of the Mears Park building. Marshall Aff. Ex. 1 p. 62.   She only avoids smoke-filled bars and restaurants today.   Marshall Aff. Ex. 1 p. 249.  Therefore, she can work in many other locations in many occupations.  This does not represent a material or substantial limitation on this activity.  Moreover, O'Connor is symptom free with her treatment.  When an impairment is corrected by medication, the person is not disabled.  Sutton v. United Air Lines, Inc., 527 U.S. 471, 483, 119 S. Ct. 2139 (1999).

O'Connor may argue that Met Council considered her disabled because of her leaves. Initially, a leave of absence alone is insufficient to establish a material or substantial limitation. Simons v. Con-Way Central Express, Inc., No. 02-3629 (PAM/RLE)(D. Minn. November 17, 2003).  Marshall Aff. Ex. 35.  A mere awareness of the condition does not establish that the employer regarded the employee as disabled.  Johnson v. Loram Maintenance of Way, Inc., 83 F. Supp. 2d 1007, 1013 (D. Minn. 2000); Coffey V. County of Hennepin, 23 F. Supp. 2d 1081, 1089 (D. Minn. 1998); Carlson, supra (statements by supervisors that plaintiff had "health issues" insufficient for a regarded as claim).  O'Connor must provide evidence to permit a reasonable juror to conclude Met Council perceived her as actually disabled under the ADA. Kellogg v. Union Pacific RR Co., 233 F. 3d 1083, 1089 (8th Cir. 2000); Conant v. City of Hibbing, 131 F.Supp. 2d 1129, 1136 (D. Minn. 2000).  Here, the statements O'Connor attributes to her supervisor indicate that O'Connor was not considered to be disabled at all.  See Wooten v. Farmland Foods, 58 F.3d 382, 386 (8th Cir. 1995)(Employer who doubted sincerity of disability did not regard employee as disabled when the employer was only restricted in performing one job).   Further, since O'Connor maintains she requires an accommodation, she cannot assert a

"regarded as" claim.  See Weber, 186 F.3d at 917(One who is only perceived as disabled has no entitlement to reasonable accommodation).

O'Connor must claim more than a medical history to establish a disability.  In Cooper v. Olin Corp., Winchester, Div., 246 F.3d 1083 (8th Cir. 2001), the Eighth Circuit held that an employee's long term depression was not a disability.  In that case, the employee worked, raised a family, took care of her home and finances and lived independently.  Id. at 1088.  Like O'Connor, she did not demonstrate a substantial limitation when compared to the general population.  Id.  O'Connor functions normally and even does not consider herself disabled. Marshall Aff. Ex. 1 p. 249.

Further, O'Connor cannot establish that she was substantially limited in the major life activity of working merely because she could not work in Mears Park.  Recently, in Coleman-Adebayo v. Leavitt, No. Civ. A. 03-2428 PLF (D.D.C. July 26, 2004), a district judge found no disability under the Rehabilitation Act when "[t]he only circumstances in which plaintiff's [medical condition] is not controlled by medication is when she is working in [the employer's] office."  Id.  Marshall Aff. Ex. 36.   "Unfortunately for plaintiff, a person whose daily life activities are not substantially limited, even though her performance at work is subject to physical limitations, is not disabled."  Id., *citing* Toyota Manufacturing v. Williams, 544 U.S. 184, 12 AD Cases 993 (2002).  Moreover, "[t]he inability to perform a singular particular job does not constitute a substantial limitation in a major life activity of working."  29 C.F.R. pt. 1630 app. § 1360(2)(j); Murphy v. United Parcel Serv., 119 S. Ct. 2133, 2138 (1999); Cooper, 246 F.3d at 1089; State by Cooper, 441 N.W.2d at 113; Fahey v. Avnet, Inc., 525 N.W.2d 568, 574 (Minn. App. 1994), *review denied*, February 14, 1995.  The impairment must prevent the individual from performing a class or broad range of jobs.  29 C.F.R. § 1630.2(j)(3)(i), 29 C.F.R.

pt. 1630 app. § 1630.2(j)(3); <u>Aucutt v. Six Flags Over Mid-America, Inc.</u>, 85 F.3d 1311, 1319 (8th Cir. 1996).  There is absolutely no evidence that O'Connor is prevented from performing a class or broad range of jobs.  Since leaving Met Council, O'Connor has held several jobs. O'Connor is not disabled.

### D.    <u>O'Connor Is Not a Qualified Individual With a Disability.</u>

In addition to proving she is disabled, O'Connor must also demonstrate that she is a "qualified individual with a disability."  42 U.S.C. § 12111(8).  There is a two-part test to determine whether an employee is "a qualified individual with a disability."  First, O'Connor must show that she "satisfies the requisite skills, experience, education and <u>other job-related requirements</u> of the employment position such individual holds."  29 C.F.R. § 1630.2(m) (emphasis added).  "[Q]ualification standards [mean] the personal and professional attributes . . . established [by the employer] as requirements which an individual must meet in order to be eligible for the position held or desired."[3]  29 C.F.R. § 1630.2(q).  O'Connor did not meet the attendance criteria for her position.

Second, O'Connor must show that she was able to perform all of the essential functions of her position with or without reasonable accommodation.  42 U.S.C. § 12111(8).  The burden is on the employee to show she could perform the essential functions of her job.  <u>Mole v. Buckhorn Rubber Prods., Inc.</u>, 165 F.3d 1212, 1217 (8th Cir. 1999).  In making a reasonable accommodation, an employer is not required to "reallocate the essential functions of a job." <u>Treanor</u>, 200 F.3d at 575, <u>citing</u> <u>Benson v. Northwest Airlines, Inc.</u>, 62 F.3d 1108, 1112-3 (8th Cir. 1995).  O'Connor could not perform the essential functions of the job—i.e., work in Mears Park and reliably attend work.  Marshall Aff. Ex. 1 pp. 209-211; Ex. 9 pp 155-56; Ex. 21; Ex. 29

---

[3]The same requirement exists under the MHRA. Minn. Stat. § 363A.03, subd. 36.

p. 33.  A person who is unable to attend work cannot meet the essential functions of the position.

Nesser v. Trans World Airlines, Inc., 160 F.3d 442, 445 (8th Cir. 1998).  Since her job required

her presence in Mears Park at least two to three days per week and accommodation of

telecommuting is not reasonable.  See Nesser v. Trans World Airlines, 160 F.3d 442, 446 98th

Cir. 1998); Vande Zande v. State of Wis. Dept. of Admin., 44 F.3d 538, 544-45(7th Cir. 1995).

Furthermore, Met Council had legitimate reasons of supervision, interaction, and job duties, for

declining that option.  Met Council did, following her grievance, permit her to work two days per

week in the Metro 94 building during the cleanup, another accommodation requested by

O'Connor.  She only worked one of those days by her own testimony. Marshall Aff. Ex. 1 pp.

209-211. Coupled with Met Council's cleaning of the building and the modernization of its

HVAC systems, its actions appear appropriate. O'Connor, in any event, is not entitled to an

accommodation of her choice.  See Coffey, 23 F. Supp. 2d at 1088 ("'[W]orking' does not mean

working at a particular job of the plaintiff's choice"); Heaser v. Toro Co., 247 F.3d 826, 831 (8th

Cir. 2001)(An employer is not required to offer the list of accommodations in every case)(citing

Treanor, 200 F.3d at 575.).

    **E.**    **O'Connor Was Reasonably Accommodated.**

    Met Council allowed O'Connor to work two days per week outside Mears Park during

the cleaning and renovation period.  She only took advantage of one of those days despite the

agreement between Met Council, O'Connor and her union.  Marshall Aff. Ex. 1 pp. 209-211.

Met Council does not have to take extraordinary measures or ignore its union obligations to deal

with O'Connor.  An employer is not required to make an overall change in its manner of

conducting business to accommodate a disabled employee.  Heaser, 247 F.3d at 832.

    **F.**    **Met Council Legitimately Terminated O'Connor**

Metropolitan Council has a legitimate, non-discriminatory reason for her termination. The mechanical application of the collective bargaining agreement with AFSCME mandated her termination. Marshall Aff. Ex. 24. O'Connor did not provide Met Council, even with her physician's May 3, 2002, certification, any information that indicated when or if she would return to work. Marshall Aff. Ex. 2. According to her physician, he was "convinced" she could not work in the building. O'Connor testified she was not able to return to her job as of May 9, 2002. This is also exemplified by O'Connor's workers compensation claim that she was "temporarily and totally disabled from May 15, 2002 to July 1, 2003," and later. Marshall Aff. Ex. 4. This also creates a presumption that she was unable to work. See Cleveland v. Policy Management Systems Corp., 526 US 795, 807 119 S.Ct. 1597 (1999); Downs v. Hawkeye Health Services, Inc., 148 F.3d 948, 951 (8th Cir. 1998) (plaintiff's previous testimony regarding disability precluded inconsistent position in subsequent disability lawsuit).

## IV.    O'Connor Has No Retaliation or Harassment Claim

### A.    Workplace Criticism is Not Harassment

Disability harassment is a relatively new claim under the ADA in this circuit. See Shaver v. Independent Stave Co., 350 F.3d 716, 719 (8th Cir. 2003). This claim is analyzed similarly to Title VII claims for sexual harassment and requires conduct that "must be both subjectively hostile or abusive to the victim and 'severe and pervasive enough to create an objectively hostile or abusive work environment--an environment that a reasonable person would find hostile or abusive.'" Id., 350 f.3d at 721(citing Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22, 114 S.Ct. 367 (1993)). The law does not create a general civility code and conduct that is merely rude, abrasive, unkind, or insensitive falls outside its scope. Id. To state a claim for hostile work environment under the ADA, O'Connor must show (1) that she is a member of the class of

people protected by the ADA; (2) that she was subjected to unwelcome harassment; (3) that the harassment resulted from her membership in the protected class; and (4) that the harassment was severe enough to affect the terms, conditions, or privileges of her employment.  Shaver, 350 F.3d at 720.

As discussed above, O'Connor's respiratory symptoms do not rise to the level of a disability, nor is there any evidence that the Met Council considered her to be disabled. Therefore she does not fall within the class of persons protected by the ADA or MHRA, and cannot satisfy the first required element of a claim of disability harassment.

With respect to the existence and severity of any alleged harassment, O'Connor relies upon a list of events which she submitted to the EEOC and alleges to have been subjected to derogatory remarks about her asthma.  Marshall Aff. Ex. 26.  O'Connor claims that her manager, Hanson, would downplay the seriousness of O'Connor's asthma, by telling her that she (Hanson) had high blood pressure, that her (Hanson's) daughter has allergies and does not miss school, and that "professionals live with those things."  Marsrhall Aff. Ex. 1 p. 239.  O'Connor also claimed that Hanson told her about a woman who worked in a doctor's lab, but had an allergy to latex gloves and had to change professions, and asked O'Connor, "why don't you?"  Id.  O'Connor also claims that Hanson would "holler" at her, and thereby embarrass her, describing an occasion where Hanson, in response to an email sent to her by O'Connor, "came screaming down the hall."  Id. at 239 – 240.

In addition to these allegations, Hanson also contended  in the letter sent to the EEOC that (1) she got emails from Hanson and project manager Jim Uttley questioning her about her work assignments; (2) she was not given work because she might be out sick; (3) she was given a poor performance review on May 12, 2002; (4) she received calls from Hanson, and Hanson's

secretary, during which they would "hang up" on her; (5) she was told by Hanson that she

(Hanson) could not let her work at home because a co-worker would also want to work from

home; (6) Hanson inspected her (O'Connor's) FMLA file and called her doctor to determine if

she was really sick.  Hanson Dep. Ex. 55).

These alleged incidents have no apparent connection to O'Connor's claimed disability,

and therefore, if they can be considered harassment at all, fail to fail to meet the third element of

a harassment claim:  that the harassment occur because of O'Connor's status as a disabled

person.  First, even O'Connor describes the emails from Uttley and Hanson as being about her

work assignments.  Marshall Aff. Ex. 26.  Inquiries by supervisors about the status of work

assignments are normal in almost any business or organization, and O'Connor offers no evidence

to suggest these inquiries were in any way related to her claimed disability.  O'Connor

recognized the difficulty her unpredictable absences placed on her assignments.  Marshall Aff.

Ex. 1 pp. 122-123.

Secondly, with respect to her claim that she was not given work, O'Connor's own

description of the incident reflects that this was caused by concern over O'Connor's absenteeism,

rather than her status as allegedly disabled.  As discussed above, it is undisputed that O'Connor

was absent approximately $1/5^{th}$ of her work time from 1999 through May of 2002.  Karels Aff.

Because of the statutory deadlines which accompanied much of the work done at the Met

Council, it was imperative that many assignments be assigned based on employee dependability.

Though some of her absences may have been related to her physical illnesses, her attendance

record is distinguishable from her disability status as a factor in making work assignments.

Third, O'Connor's complaint that she received a poor performance review on May 12,

2002, also reflects no apparent connection to her disability status.  That performance review,

authored by Phyllis Hanson, reflects many criticisms of her skills and job performance. Marshall Aff. Ex. 7. Significantly, O'Connor also received a poor review in 2001, from her prior manager, Dick Thomson. Marshall Aff. Ex. 6. Those reviews evidence only that she was a poor performer during those time period, and O'Connor has offered nothing to link those appraisals to her alleged disability.

Fourth, O'Connor's description of being yelled at by Hanson, while abrasive, specifically notes that Hanson was upset not at her disability status, but with an email she had received from O'Connor. Marshall Aff. Ex. 1 p. 240. Specifically, O'Connor explained that Hanson was upset with what she (Hanson) believed was O'Connor's spreading of false information about a building cleaning project. Id. at 242-43.

Similarly, O'Connor's allegation that Hanson would call, but hang up on her, while O'Connor worked at Metro 94, also has no apparent linkage to O'Connor's disability status. Accepting, for sake of argument only, that this allegation is true, O'Connor has offered nothing more than speculation that it was harassment. Calls like this are too speculative to maintain a claim. Rouillard v. Potter, No. 01-2158 (ADM/RLE) (D. Minn. May 5, 2003). Marshall Aff. Ex. 39. The claimed incidents of remarks and occurrences are not actionable. Id.

In Rouillard, the plaintiff received two years of "mocking glances, rude comments, embarrassing situations and prank phone calls." While "inconsiderate and painful," they did not create a hostile environment. The law exacts a high threshold and O'Connor' s alleged conduct does not meet it. See Gonzales v. City of Minneapolis, No. 02-710 (PAM/RLE) (D. Minn. June 13, 2003)(Name calling including "wimp," "sissy," "useless," and "worthless" insufficient). Marshall Aff. Ex. 41.

In <u>Shaver</u>, the court considered a claim of harassment based on disability brought by an employee who has suffered from epilepsy, and who, after a brain operation had had a steel plate inserted in his head. <u>Shaver</u>, 350 F.3d at 719. The plaintiff alleged that a supervisor disclosed this information to plaintiff's co-workers. <u>Id.</u> at 721. Thereafter the plaintiff claimed to have been nicknamed "platehead," referred to as "platehead" by both co-workers and supervisors for two years, and regarded to be stupid. On one occasion a co-worker stated that the plaintiff "pissed in his pants when the microwave was on." <u>Id.</u> at 722. On other occasions co-workers call him stupid, and said he was "not playing with a full deck." <u>Id.</u> at 720. The Court of Appeals for the Eighth Circuit reasoned that while the environment was offensive, it did not rise to the level which prior cases found sufficient, such as where the claimants had demonstrates psychological trauma, where threats of death or physical injury were present, or where the harassment was of a physical nature. Id. at 721-22. The court also rejected the contention that a claim of harassment could be based on a claim of invasion and disclosure of medical information, reasoning that a claim for invasion of privacy rights was a separate cause of action from that of harassment. <u>Id.</u> at 722.

Similarly, O'Connor here claims to have been harassed based on Hanson's alleged invasion of her FMLA file, and her contacting of O'Connor's doctor. Significantly, O'Connor's description of having been informed of this alleged invasion by human resource employee Kathy Colvin, who allegedly heard it from Hanson, establishes this as inadmissible hearsay[4]. Marshall Aff. Ex. 1 p. 233. The Eighth Circuit has condemned the use of hearsay to defeat summary judgment. See <u>Reynolds v. Land O'Lakes, Inc.</u>, 112 F.3d 358, 364 (8th Cir. 1997); <u>Davidson &</u>

---

[4] O'Connor testified she called her doctors who reported they had not spoken with O'Connor's supervisor. This event has absolutely no evidentiary support. Speculation, conjecture, and fantasy provide no basis to avoid summary judgment. <u>Gregory v. Rogers</u>, 974 F.2d 1006, 1010 (8th Cir. 1992); <u>Atkinson v. Prudential Property Co.</u>, 43 F.3d 367, 371-72 (8th Cir. 1994); <u>McCormack v. Citibank, N.A.</u>, 100 F.3d 532, 542 (8th Cir. 1996); <u>Callanan v. Runyun</u>, 75 F.3d 1293, 1297 (8th Cir. 1996).

Schaaff, Inc. v. Liberty Nat. Fire Ins. Co., 69 F.3d 868, 871 (8th Cir. 1995); JRT, Inc. v. TCBY

Systems, Inc., 52 F.3d 734, 737 (8th Cir. 1995); Fireman's Fund Ins. Co. v. Thien, 8 F.3d 1307,

1310 (8th Cir. 1993).  More significantly, the Eighth Circuit's holding in Shaver makes clear that

a disclosure of medical information does not support a cause of action for harassment.

 The remaining allegations do not even rise to the level of those in Shaver, which the court

found not to be actionable.  Nowhere in her allegations does O'Connor claim to have been

mocked or made the butt of jokes.   The conduct complained of by O'Connor was not physically

threatening, nor of a physical nature.  Moreover, O'Connor's experience is far more mundane

that that dealt with in Shaver, where the plaintiff was referred to as "platehead" and "stupid" for

two years, and kidded as having "pissed in his pants when the microwave is on."  This claim

should be dismissed.

 **B.** **O'Connor Has No Retaliation Claim**

 To state a prima facie claim of retaliation, O'Connor must show that (1) she attempted to

exercise or assert her rights under the law, (2) that she suffered an adverse employment action,

and (3) evidence of a causal link between the two.  Heisler v. Metropolitan Council, 339 F.3d

622, 632 (8th Cir. 2003).  At the time of her termination, Met Council had given her the

accommodation requested at the time, working two days per week at an alternative location

during the Mears Park building cleaning work.  That work was completed.  O'Connor submitted

a physician's note that only indicated she was receiving antibiotics and had a follow-up

appointment in mid-May.  It did not request additional leave or any other accommodation

although O'Connor assumes it would be enough to do so.  O'Connor admittedly did not request

anyone in management for any accommodation.  She spoke only with her union steward who did

not request any additional leave.  She was expected to return on May 9 and did not do so.  She

told no one she would not return.  Her employment resulted from her own failure to return and operated as a resignation under the AFSCME contract, not a termination.  Her termination has nothing to do with any assertion of rights protected under the law.

## CONCLUSION

In her deposition, O'Connor testified that, legal definitions aside, she does not consider herself disabled.  Legally, she is not disabled.  She has no claims under those laws protecting leave rights and those legitimately disabled.  O'Connor received the benefit of the leave laws but did not return to work despite the lack of a disability.  Her claims should be dismissed.

For these reasons, Met Council respectfully requests the Court grant its motion in its entirety and put an end to this lawsuit.

Dated:  **August 2, 2004**                              JACKSON LEWIS LLP

                                                                          *s/Thomas E. Marshall*
_____
                                                                          Thomas E. Marshall (#155597)
                                                                          Jon S. Olson (#278440)
                                                                          150 Fifth Street Towers, Suite 1450
                                                                          150 South Fifth Street
                                                                          Minneapolis, Minnesota 55402
                                                                          Telephone: (612) 341-8131

                                                                          ATTORNEYS FOR DEFENDANT
                                                                          METROPOLITAN COUNCIL